101 So.2d 265

## LOUISVILLE & NASHVILLE RAILROAD COMPANY

v.

**Edgar L. JOHNS, as Adm'r.**

3 Div. 696.

Supreme Court of Alabama.

March 6, 1958.

Steiner, Crum & Baker, Montgomery, and B. E. Jones and R. L. Jones, Evergreen, for appellant.

Jones & Nix, Evergreen, for appellee.

COLEMAN, Justice.

This is an action by the administrator of the estate of J. A. Johns, deceased, to recover damages from Louisville and Nashville Railroad Company, a corporation, for the death of plaintiff's intestate, who was run over by the cars of defendant on its tracks in Evergreen, Alabama.

On the former appeal, Louisville & N. R. Co. v. Johns, 258 Ala. 440, 63 So.2d 574, 578, we held there was a fatal variance between the pleading and proof in that all counts of the complaint alleged that deceased was injured while he was crossing the tracks of defendant, but the " * * * proof * * * was undisputed that the deceased at the time of his injury was walking longitudinally along the track of the defendant and between the rails."

We further held on the former appeal:

" * * * that the defendant was entitled to the general affirmative charge as to count 4 (charging simple negligence) because there was no proof of any negligence on the part of the defendant.

* * * * * *

" * * * the deceased, under the undisputed evidence, was guilty of contributory negligence and for this reason the defendant was entitled to the affirmative charge as to count 4. (Citations omitted.)

* * * * * *

" * * * we fail to see how the facts in this case can substantiate a charge of subsequent negligence. * *

* * * * * *

"We do not consider that there was evidence to support the charge of wilful or wanton wrong set out in counts 6, 7 and 8 and the general charge which was requested separately as to each of these counts should have been given." (Parenthesis added.) 258 Ala. 440, 447, 448, 450, 63 So.2d 574, 580, 581, 584, supra.

On the second trial, the evidence was in dispute as to whether deceased was crossing the track or walking longitudinally between the rails, and on this second trial the jury found a verdict for plaintiff on which judgment was entered. Defendant appeals from that judgment and from the judgment overruling defendant's motion for a new trial.

For a detailed description of the place where the injury occurred and the movements of the train, we refer to the opinion on former appeal, supra.

To summarize briefly, the tracks of defendant are located in the center of the city of Evergreen, the general direction of the tracks being north and south. Defendant has there four straight, parallel, connected tracks, and there is a street on each side of the railroad open up to the edge of the railroad right of way. These streets are called East Front Street and West Front Street, respectively. The injury to deceased occurred on the easternmost track, which is called the team track.

The L & N Station is at the south end of town. Just at the north end of the station over the four tracks and at right angles thereto, there is a public crossing known as the Depot Crossing which connects East Front Street and West Front Street. Four hundred and twenty-three feet north of the Depot Crossing is another public crossing connecting East and West Front Streets. This latter crossing is called the Rural Street Crossing. The injury to deceased occurred on the team track between these two grade crossings. Count 6 of the complaint alleges that deceased was proceeding across the tracks "at a point 250 feet South

of the Rural Street Crossing," and Counts 7 and 8 fix the point at "to-wit: 250 feet South of the Rural Street Crossing." As we understand the testimony, the point where deceased was injured was approximately 150 feet south of Rural Street Crossing. The tracks between the Depot Crossing and Rural Street Crossing appear to be almost level, although there was testimony showing a rise of $^{91}/_{100}$ths of a foot to the north on the team track.

Over defendant's objection, evidence was introduced to show that numbers of people were accustomed to cross the defendant's railroad tracks between West Front Street and East Front Street, over the entire area between the two crossings, between the hours of eleven o'clock and noon. W. A. Suddith placed the number of persons at 25 to 30; J. D. Hyde at around 50 or 60; H. L. Riley at sometimes a dozen, sometimes maybe fifty; M. E. Wilson at 8 or 10.

About noon, on the day of the accident, a local freight train of defendant, going south, came in on the second track from the west and traveled on south until the caboose was south of the depot crossing. After receiving instructions at the depot, the train crew switched the engine with the merchandise car attached, over to the team track and there picked up three box cars and also a car of pulpwood. The car of pulpwood was the last car from the engine. The trainmen proceeded to "kick" or push the pulpwood car onto the main track, which is the second track from the east. The pulpwood car stopped and was "chocked" on the main track between the two crossings. The engine with four cars attached pulled back south onto the team track.

After pulling the cars onto the team track, and after the switch from the main line to the team track had been closed, the engine with the cars behind it, was backed up north along the team track to give the cars an impetus towards the north. After receiving this impetus the last three box cars were uncoupled from the engine and permitted to roll free, the purpose being to cause them to roll on north along the team track across the Rural Street Crossing until they should stop. The testimony as to the speed of the cars when they hit Johns varies from 4 or 5 to 15 or 20 miles per hour. No person was on the cars after they were cut free from the engine, which was stopped in the vicinity of the Depot Crossing. This operation is referred to as a kicking or flying switch.

During the switching operations, the witness Bethea, trainman employee of defendant, was protecting the Depot Crossing, and the witness Hicks, flagman, was stationed at the Rural Street Crossing. As to his duty to direct the switching movements, Hicks testified as follows:

"Q. And whose duty was it to get the switching orders? A. The conductor would get them.

"Q. And when the conductor got them who did he pass them on to? A. To me.

"Q. He passed them on to you. And then was it—whose duty was it to pass it on and direct the engineer as to the movement? A. I did it."

At some time during the switching operations, plaintiff's intestate, Johns, entered the railroad right of way on the west side at a point between the two crossings. The testimony is without dispute that he walked directly across the tracks of defendant without stopping, until he reached the easternmost track, known as the team track.

While the three cars were rolling north along the team track, they struck the intestate, Johns, at a point 150 feet, more or less, south of the Rural Street Crossing. As a result of injuries there received Johns died.

As we have noted above, the testimony on the first trial was undisputed that Johns reached the team track a safe distance north of the rolling cars, and then turned and

walked north along the team track between the rails until he was struck from behind by the cars. On the first trial, Floyd Dees, who was an eyewitness, testified for plaintiff. Dees' testimony was to the effect that Johns, when injured, was walking north between the rails of the team track. On the second trial, Dees was not placed on the stand by either party.

On the second trial, plaintiff placed on the stand Charles Barfield who did not testify on the first trial. Pertinent portions of Barfield's testimony are as follows:

"Q. Where did you first observe him (Johns)? (Par. Add.) A. Just beyond the railroad tracks there, this side.

"Q. Beyond what we call the team track, or the main track? A. Sir?

"Q. The easternmost track next to the West front street over there where you observed him? A. Yes sir.

"Q. That's what is known as the team track isn't it, or do you know? A. I don't know about that.

"Q. But it was the easternmost track, you observed him just about the time he got there and started to cross? A. That's right.

"Q. Well now, Mr. —— did he just come right straight across the track? A. He was coming straight across, you might say straight.

"Q. And as he came, why what happened to him? A. Well he was down in front, going across the road and when he discovered the shape he was in he gave a jump looked like, and fell and the wheels cut his legs.

"Q. Did you see—did you hear anybody say anything to him? A. No I didn't.

\* \* \* \* \* \*

"Q. Now, you were looking right at Mr. Johns coming across, did you see those loose box cars coming down the railroad? A. I saw them when they hit him.

\* \* \* \* \* \*

"Q. Then you could see the box cars couldn't you? A. Yeah, I saw them.

"Q. And he just stepped right in front of them as he was going across? A. He was going across the railroad when I saw him.

"Q. Going across the railroad tracks? A. Yes sir.

"Q. Did he stop on the track? A. No he didn't stop, he just looked around and it was so close on him, I reckon it scared him and he saw he couldn't get across and he made kind of a lunge. He tried to get over.

"Q. Then he just stepped right in front of them did he not? A. No, he didn't step in front of them, he was down on the track before he even saw them.

\* \* \* \* \* \*

"Q. Did he ever stop at all? A. If he did, I didn't see him.

\* \* \* \* \* \*

"Q. Well, I'm asking you if he stopped at any time? A. No, he didn't stop.

"Q. Then he had to walk right in front of the cars did he not, if he never did stop and didn't have time to go across? A. I don't know whether you call it walking in front of it or not, he was crossing.

"Q. And didn't have time to cross? A. No, he didn't have time to cross I don't reckon.

\* \* \* \* \* \*

"Q. And he never did stop after you saw him? A. No sir.

\* \* \* \* \* \*

"Q. Well, I am going back to that question again. After you saw Mr.

Johns coming across the railroad, did he ever stop? A. He didn't stop.

\* \* \* \* \* \*

"Q. And he was walking right towards that and never stopped? A. He walked across the railroad.

"Q. And before he could cross the cars hit him? A. Yes sir."

Theodore Sherman who did not testify on the first trial was also called by plaintiff on the second trial. Sherman's testimony in pertinent part is as follows:

"Q. Well, on that occasion did you observe someone coming across the track? A. Yes sir, I did. But I didn't until I heard somebody hollering.

"Q. Well, when you heard the hollering, where was the man, did you know Mr. Johns? A. Well, I didn't know him personally, I hadn't never met him at that time that I know of. I could have, but I wouldn't say positively I did. I seen him just as he was beginning to make his step across the first railroad track.

"Q. That is the easternmost track that you have reference to? A. That's right.

"Q. Just as he stepped over that what happened? A. Well, just as he stepped over the first track I heard the brakeman, I reckon it was the brakeman, I never did see anybody but I heard somebody holler, 'get out of the way.' Whenever I heard that I looked and this man was just putting his right foot down in the middle of the track fixing to cross over the steel, and it seemed like the railroad shivered or jumped underneath his feet, and made him notice it and when he did, well he looked and jumped.

"Q. And the train caught him? A. Caught his right foot.

"Q. Was he walking across the track? A. He was coming bias-some about 45 degrees I would say.

\* \* \* \* \* \*

"Q. Is it not a fact that he turned north up there to come on up to where you was in the truck? A. No sir.

"Q. Then he was going almost directly, just a little at an angle across that track, somebody yelling at him and yet he stepped on with the cars so close on him that they hit him before he could get across? A. Well I don't believe he ever heard the yelling, he didn't seem to.

"Q. Which way was he looking? A. Well, he was looking just straight forward as he was coming.

"Q. You didn't see him look up and down the track at all? A. Well you see, he was already coming across the track whenever I seen him, I don't know what he done before he got there.

"Q. Well when you first saw him—there was four tracks there, when you first saw him, which track was he on? A. The last track.

"Q. The last track. You just saw him about the time he stepped on and there was somebody yelling at him then? A. Yes sir.

"Q. And yet he stepped right on in front of the cars? A. That's right.

"Q. They hit him before he could get across? A. Well he seen it—he looked around and seen it after he got out in the middle of the track, but he didn't have time to jump and clear it then."

On the second trial, the flagman Hicks, who had been a witness called by defendant on the first trial, testified that he, Hicks, while at or near the Rural Street Crossing, saw Johns "\* \* \* coming from the west over this way going across \* \* \*;" that Johns walked across the three westerly tracks without stopping or looking either way; that Johns while crossing the tracks was looking "Right straight across. Kind of walking with his head down;" that Johns was "Going east looking down,"

and without stopping or looking "stepped in between the team track and came walking north;" and that when Johns stepped on "the team track, if he had continued walking on across in the direction he was going," he would have had ample time to clear the track in advance of the approaching cars which were then a couple of car lengths distant.

Hicks further testified that when Johns turned north on the team track, he, Hicks, immediately "broke into a run and started slinging my arms and hollering at him (Johns);" and that when Johns turned north he was "about a hundred feet or further maybe," from Hicks.

If the testimony of Hicks had been uncontradicted, we would arrive at the same result as on the former appeal, but Hicks' testimony was contradicted as we have noted above.

Testimony was taken after issue joined on Counts A and B which charged simple negligence, Count C charging subsequent negligence, Counts 6 and 7 charging that the corporate defendant "willfully or wantonly" caused the death of intestate, and Count 8 which charged that the death of intestate was caused by the "willful or wanton" acts of the employees of defendant "while acting within the line and scope of their authority and employment." To Counts A, B, and C, defendant pleaded in short the general issue and contributory negligence, and to Counts 6, 7, and 8 the general issue.

The trial court gave the affirmative charge with hypothesis for defendant on Counts A and B. The affirmative charge with hypothesis separately requested by defendant to each of the remaining Counts C, 6, 7, and 8, was refused.

■ Brief of appellant contains no statement of "Propositions of Law" as required by Revised Supreme Court Rule 9, Code 1940, Tit. 7 Appendix. Since, however, this case was submitted before the effective date of the revised rules, and does contain thorough argument citing authorities on the propositions argued by appellant, under the liberal construction applied to the former rules by this court we have considered the assignments of error which are adequately argued.

Appellant assigns as error the action of the trial court in overruling demurrer to each count of the complaint but these assignments are not argued in brief and are, therefore, waived. Supreme Court Rule 9. We do not consider the sufficiency of the complaint on demurrer, but treat each count as being legally sufficient.

### Assignments of Error 15 and 16.

■ Appellant argues that the court erred in refusing the general affirmative charge with hypothesis to the complaint as a whole. The rule is:

"* * * where the affirmative charge was refused the defendant, the entire evidence must be viewed in its most favorable aspect to the plaintiff and where this is done and a reasonable inference may be drawn adverse to the party requesting the affirmative charge, such charge is properly refused. * * *" Atlantic Coast Line R. Co. v. McMoy, 261 Ala. 66, 72, 73 So.2d 85, 90; 18A Ala.Dig., Trial, ☞142 and 178, and numerous cases there cited.

Because, as hereinafter stated, we hold that reasonable inferences which support Counts C and 8 may be drawn from the evidence, and that the affirmative charge with hypothesis which was requested separately to those counts was properly refused, we also hold that the same charge requested jointly to all four counts was refused without error.

### Assignments of Error 31 and 32.

Appellant argues that the refusal of the affirmative charge requested by defendant to Count C was reversible error. Count C charged subsequent negligence as follows:

" * * * which said negligence consisted in this: said servants, agents or employees, after becoming aware of the peril of the Plaintiff's intestate being run against, over or upon by said train, negligently failed to use all the means at their command to avoid said train running over, upon or against Plaintiff's intestate and inflicting injuries from which he died, when by the use of said means said train would have been prevented from running against Plaintiff's intestate and killing him, all to the damage of the Plaintiff, hence this suit."

Appellant asserts that it was entitled to an affirmative instruction against Count C because: first, there was no proof that any employee of defendant could have prevented the injury to the intestate, Johns, after he was discovered in a position of peril by such employee; and second, that the allegation that Johns was struck by a "train" is not supported by the proof that he was struck by "cars which were at the time no part of the train."

On the former appeal, we held there was no proof of subsequent negligence on the part of defendant. There the testimony was not disputed that the flagman Hicks used all means at his command to warn the intestate after Hicks saw Johns turn and walk north between the rails in front of the approaching cars.

Viewing the evidence on the second trial in the aspect most favorable to plaintiff, we are of opinion that the jury could reasonably infer that Johns, the intestate, did not turn and walk longitudinally between the rails of the team track but attempted to walk across the track as testified by Barfield; that the flagman Hicks saw Johns enter the railroad property from West Front Street, walk straight across three tracks without pausing or looking to the right or left, but looking down; that Johns was not aware of the approach of the cars until after he had stepped on the team track immediately in front of the cars; that the flagman Hicks was fully aware of the switching operation and that Johns was rapidly approaching a place of danger and that injury to Johns might result if he, Hicks, failed to give warning; that Hicks was close enough to Johns so that Hicks could have effectively given such warning in time to prevent the injury; that although Hicks had such knowledge, he failed to perform his duty to give such warning; and that the failure of Hicks to give the warning was the proximate cause of the injury.

Appellant argues that Johns' negligence in failing to stop or look before he stepped onto the team track is such contributory negligence as will bar recovery under Count C. Johns' aforesaid negligence was such contributory negligence as would bar recovery for simple initial negligence and the trial court so instructed the jury in giving the affirmative charge as to Counts A and B which charged simple negligence.

The rule applicable here as to the contributory negligence of plaintiff which will defeat his recovery for negligence of defendant after discovery of plaintiff's peril has been stated as follows:

" * * * The rule, as laid down by this court, as in other jurisdictions, including England, is that while the plaintiff's intestate's negligence in being on the track would defeat a recovery for initial or antecedent negligence, yet he could recover if defendant's servants, in charge of the train, became aware of the intestate's peril in time to avoid running over him by the proper use of preventative means at their command, and negligently failed to resort to such means, to conserve his safety, provided the intestate himself was free from negligence after becoming conscious of his danger. * * *" Central of Georgia Railway Co. v. Blackmon, 169 Ala. 304, 310, 53 So. 805, 807.

See, also: Birmingham Ry., Light & Power Co. v. Aetna Accident & Liability Co., 184 Ala. 601, 64 So. 44; Sprinkle v. St. Louis & S. F. R. Co., 215 Ala. 191, 110 So, 137; Northern Alabama Ry. Co. v. Elliott, 219

Ala. 423, 122 So. 402; Western Ry. of Alabama v. DeBardeleben, 226 Ala. 101, 145 So. 431 [infra]; Heffelfinger v. Lane, 239 Ala. 659, 196 So. 720; Callaway v. Griffin, 245 Ala. 598, 18 So.2d 547.

The authorities relied on by appellant to support its argument for the general charge requested as to Count C (among them: Callaway v. Eason, 248 Ala. 523, 28 So.2d 560; Birmingham Southern R. Co. v. Kendrick, 247 Ala. 573, 25 So.2d 419; Western Ry. of Alabama v. DeBardeleben, 226 Ala. 101, 145 So. 431; DeBardeleben v. Western Ry. of Alabama, 227 Ala. 553, 151 So. 56; and Racine Tire Co. v. Grady, 205 Ala. 423, 88 So. 337), have been carefully examined, but to differentiate all of them here would prolong this opinion to undue length and serve no useful purpose. Suffice it to say that each of them presents a distinct difference from the instant case on a substantial issue of fact and in no manner conflicts with the conclusion here reached.

In Northern Alabama Ry. Co. v. Henson, 210 Ala. 356, 98 So. 18, cited by appellant, this court held that the evidence was not sufficient to support an inference that the trainmen saw deceased in time to avoid the injury. In the case at bar, the flagman, Hicks, saw Johns come onto the series of tracks from the west and cross three of the tracks. Without dispute, Hicks saw and observed Johns for a substantial length of time before Johns stepped on the team track. The evidence here is sufficient to support an inference that Hicks had knowledge of the peril of Johns in time to prevent the injury.

In Louisville & N. R. R. Co. v. Porter, 196 Ala. 17, 71 So. 334, 335, the errors pointed out were overruling objection to a question and giving a misleading and erroneous oral charge. Moreover, in that case, as on the first trial of the instant case: "Clearly, the deceased was a trespasser upon the track," because "when he reached the middle of the house track, he turned and started walking along that track to the south." Barfield's testimony on the second trial here is to the effect that Johns was not walking along the track but was crossing it.

In other cases cited by appellant to support its right to the affirmative charge as to Count C, the evidence failed to show that the employees of the defendant had knowledge of the peril in time to prevent the injury. In the instant case, as we have indicated, the evidence will support an inference that Hicks had knowledge of the peril at a time when he could have effectively given a warning to prevent the injury. Hicks himself testified that he saw Johns cross the three westerly tracks without stopping or looking.

Appellant argues that the fact that Johns was looking down does not support an inference that he was not aware of the approaching cars, and that he was looking down because the steel rails were above the ground and the surrounding area was covered with slag. The evidence also is that Johns looked neither to right nor left. Barfield testified that Johns "was down on the track before he ever saw" the cars. Sherman testified that "it seemed like the railroad shivered or jumped underneath his feet, and made" Johns notice the cars; and that "he looked around and seen it after he got out in the middle of the track, but he didn't have time to jump and clear it then." Under the whole evidence, we think the question of Johns' awareness of his peril was for the jury.

In considering appellant's second contention that the cars which struck Johns were not a "train," we find the following definition of "train":

"10. A connected line of cars, etc., on a railroad, without or with the locomotive." Page 2183 of Webster's New International Dictionary, published by G. & C. Merriam Company, 1925.

In other jurisdictions where the meaning of "train" has been considered in similar cases, we find the following statements:

"The defendant also contends that the cars which were switched onto the

track where Caron was working did not constitute a train at the time of the accident; * * *. It is not easy to define what, under all circumstances, would constitute a train, within the meaning of the statute. A locomotive, with one or more cars attached to it, with or without passengers or freight, in motion upon a railroad from one point to another by means of power furnished by the locomotive, would undoubtedly constitute a train. Dacey v. Old Colony Railroad Co., 153 Mass. 112, 26 N.E. 437. So it would if the steam was shut off from the locomotive, and the train was moving by its own momentum. Whether a single car, under such circumstances, would constitute a train, or whether a number of cars coupled together and at rest would constitute one, we need not now consider. The word 'train,' as used in the railroad act (Pub.St. c. 112), generally signifies cars in motion. Usually the power would be furnished by a locomotive. But whether a number of cars coupled together and in motion, and forming one connected whole, do or do not constitute a train, does not depend, we think, upon whether a locomotive engine is attached to them at the time, and they are moved by the power thus supplied. The liability to accident for which St.1887, c. 270, was designed to furnish a remedy would be the same in kind, though perhaps not so great in degree, whether the motive power was furnished by a locomotive attached to the cars or in some other manner. And it seems to us that a number of cars, coupled together as these were, forming one connected whole, and moving from one point to another upon a railroad, in the ordinary course of its traffic, under an impetus imparted to them by a locomotive, which, shortly before the accident, had been detached, constitute a train, within the meaning of St.1887, c. 270, § 1, cl. 3. See Devine v. Boston & A. Railroad Co., 159 Mass. 348, 34 N.E. 539; Cox v.

Railway Co., 9 Q.B.Div. 106; Rob. & W. Employ.Liab. (3d Ed.) 300." Caron v. Boston & A. R. Co., 164 Mass. 523, 42 N.E. 112, 113.

In Denver & R. G. R. Co. v. Vitello, 21 Colo.App. 51, 121 P. 112, 118, the court held that "* * * four cars and a caboose, from which the engine had been detached at the time the cars started uncontrolled down the grade" constituted a train.

█ We are of opinion that proof that the intestate was run over by three connected cars unattached to an engine, moving under momentum recently imparted to them, will support an allegation that the intestate was run over by a "train."

This case is similar in principle to Snider v. Alabama Great Southern R. Co., 210 Ala. 119, 97 So. 209. In that case, "* * deceased was crossing the track, not at a regular crossing, the train was approaching slowly, and it was held that the jury could find that the engineer was due to give a blast of the whistle in an effort to avert the danger." Robertson v. Southern Ry. Co., 224 Ala. 640, 141 So. 559, 560.

█ In the Snider case [210 Ala. 119, 97 So. 210], the controlling consideration on rehearing was a failure of the evidence to show without contradiction, that deceased was looking "towards the train." The court found "that there was sufficient dispute on this point as to make it a question for the jury as to whether or not the intestate was guilty of subsequent negligence, that is, continuing her way across after becoming aware of the approach of the train." In the instant case, it was open to the jury to find that the intestate, Johns, was not aware of the approaching cars, and that the flagman, Hicks, was guilty of subsequent negligence in failing to give a warning to Johns before he stepped on the team track. The affirmative charge to Count C was properly refused.

### Assignment of Error 34.

Assignment of error 34 is to the effect that the trial court erred in overruling de-

fendant's motion for a new trial. In brief, appellant states:

"* * * The motion contained the usual grounds to the effect that the verdict of the jury was not sustained by the evidence. * * * In the first place this motion for new trial should have been granted under the theory of Estoppel."

In this connection appellant argues that because the plaintiff produced testimony on the first trial showing that the intestate, Johns, was walking longitudinally between the rails when he was struck, the plaintiff cannot on the second trial prove that the intestate was not walking between the rails but was crossing the track.

To support this argument appellant cites the following proposition of law:

"* * * It is a familiar statement of the law of estoppel that 'a party who has, with knowledge of the facts, assumed a particular position in judicial proceedings, is estopped to assume a position inconsistent therewith, to the prejudice of the adverse party.' (Citations omitted.)" Brown v. French, 159 Ala. 645, 648, 49 So. 255.

Brown v. French, supra, was an action of forcible entry and detainer. On the first trial of that case the defendant made affidavit that he entered peaceably, "* * * and not under claim of any agreement" with plaintiff. On appeal from the first trial, this court held that plaintiff was entitled to the general charge, and the cause was reversed and remanded.

On the second trial of Brown v. French, supra, over the objection of plaintiff, defendant gave evidence to show that the plaintiff had agreed to his entry. On the second appeal, this court held that, "the defendant should not have been allowed to introduce testimony in contradiction of the affidavit upon which he had brought his case into the circuit court * * *."

In the instant case, it does not appear that objection was made by defendant to introduction of the contradictory testimony offered by the plaintiff. We are not clear to the conclusion that the estoppel is properly presented for our review under the authority of Brown v. French, supra. However, in Brown v. French, supra, the estoppel arose because the defendant offered testimony to contradict his own sworn affidavit. In the instant case, the estoppel claimed would be an estoppel to introduce testimony of a witness on the second trial to contradict the testimony of a different witness given on the first trial. In the instant case, plaintiff did not testify or make an affidavit. This is not a situation where a party contradicts his own sworn testimony given on a previous trial.

No case on this particular point has been cited to us from this jurisdiction. In C.J.S. we find the following:

"* * * A party is not bound by the testimony of his witnesses at a former trial where the testimony of other witnesses at a subsequent trial is inconsistent therewith, and he need not explain the testimony of his witnesses at the former trial." 31 C.J.S. Evidence § 402, p. 1210.

In dealing with this question, other courts have written as follows:

"Even though there were, in fact, an inconsistency between the testimony of Deines and Jackson in stating that they closed the doors and the testimony of Fleck tending to show that Katz did not open them, yet there was no duty upon the plaintiff to explain the testimony of these men whose credibility she vouched for at the former trial. Even if plaintiff herself had testified in the former trial * * * she would not have been conclusively bound by such an admission. (Citations omitted.)" Katz v. North Kansas City Development Co., 223 Mo.App. 606, 14 S.W.2d 701, 707.

In another case, the court said:

"The fact that the sole witness at the first trial of a case against a city for

damages, for the death of a person caused by the wheel of the wagon in which deceased was sitting, falling into a hole in the pavement and throwing him out, testified that the hole was at a certain place, does not render inadmissible at a subsequent trial the testimony of other witnesses that the hole was at another place." Hartray v. City of Chicago, 197 Ill.App. 446, 448.

■ While under the authority of Brown v. French, supra, it would appear that on a second trial, a party is not to be permitted against timely objection, to contradict his own sworn testimony on a material matter given at the first trial, we hold that the rule in this jurisdiction is that a party is not estopped to offer, at a second trial, testimony contradicting the testimony of his own witness given at the first trial. The motion for new trial was overruled without error with respect to the estoppel here urged by appellant.

Assignments of Error 21 and 22.

Assignments of error 21 and 22 are that the court erred in refusing to give the affirmative charge requested as to Count 8.

In pertinent part, Count 8 charges:

"* * * Plaintiff further avers that on said occasion and at the time and place aforesaid, said duly authorized agents, servants, or employees of defendant, while acting within the line and scope of their authority, so willfully or wantonly conducted the operation of the said locomotive and the said cars as to willfully or wantonly cause a number of freight cars to run over, upon, or against the person of plaintiff's intestate at said time and place, thereby willfully or wantonly killing said intestate * * *."

This court has said:

"While as to liability and the defenses which may be interposed, there is no difference between wanton injury and willful or intentional injury, there is a well-recognized distinction in the elements of these two classes of wrongs. To constitute willful or intentional injury there must be a knowledge of the danger accompanied with a design or purpose to inflict injury, whether the act be one of commission or omission, while in wantonness this design or purpose may be absent, and the act done or omitted with knowledge of the probable consequence, and with reckless disregard to such consequence. (Citations omitted.)" Central of Georgia Ry. Co. v. Corbitt, 218 Ala. 410, 411, 118 So. 755, 756.

■ We have indicated that the jury could find that Hicks failed to discharge a duty resting on him to give a warning. If the jury should so find, can we say, as a matter of law, there was a total want of evidence of conscious indifference to consequences which may be termed wantonness, on the part of Hicks? Our conclusion is that we cannot, and that the affirmative charge requested to Count 8 was refused without error.

If the jury should find that Hicks was apprised of the peril of Johns in time to save him by the prompt use of any means at his command, and thereupon Hicks, through mere inattention or inadvertence, omitted to do what he might have effectually done to save deceased, then defendant was liable under Count C. If the jury should find that Hicks willfully or with conscious indifference to the probable consequences of the situation thus known to him omitted to do what he might have effectually done to save Johns, then defendant was liable under Count 8. We are of opinion that this issue of fact was properly submitted to the jury under Counts C and 8.

In Louisville & N. R. R. Co. v. Porter, 196 Ala. 17, 20, 71 So. 334, 335, Sayre, J., writing for the court, said:

"* * * if the engineer was apprised of the presence and peril of deceased upon the track in time to save him by the prompt use of any means

at his command, and thereupon negligently, willfully, or with conscious indifference to the probable consequences of the situation thus known to him, omitted to do what he might have effectually done to save deceased, then defendant was liable under the first or second count of the complaint, according as the jury may have found that the engineer intended to kill plaintiff's decedent or was consciously indifferent to that result on the one hand, or that his omission was the result of mere inadvertence on the other. * * *"

Assignments of Error 13, 14, 17, 18 and 34.

Appellant assigns as error, the refusal of the affirmative charge as to Counts 6 and 7 and the giving of a portion of the oral charge to which appellant duly excepted. This insistence is based on the failure of the evidence to prove corporate participation in the act or omission which injured plaintiff's intestate.

Absence of this evidence was specifically called to the attention of the trial judge before the jury retired. The record discloses that before the case was submitted to the jury, counsel for appellant said to the court:

"* * * But as to Counts 6 and 7 charge a corporate wrong, the wrong directed to the corporation and we insist, we raise the point that under those counts they must prove the corporation either directed or ratified it."

Count 6, in pertinent part, states as follows:

"* * * Plaintiff further avers that on said occasion and the time and place aforesaid, defendant so willfully or wantonly conducted the operation of said locomotive and cars as to willfully or wantonly cause a number of said freight cars to run over, upon or against the person of plaintiff's intestate at said time and place, there-

by willfully or wantonly killing said intestate, all to the damage of plaintiff as aforesaid."

There is no evidence proving corporate participation. Appellee contends that proof of wanton or willful misconduct by the servants of defendant is sufficient to support the allegation of willful or wanton misconduct by the corporate defendant, under the provisions of Act 670, approved October 9, 1947, General Acts 1947, page 513, Code of Alabama 1940, Title 7, Pocket Parts, Section 138(1).

The validity of this act has heretofore been twice considered by this court, but no final adjudication thereon delivered. In Birmingham Transit Company, a Corporation, v. Tommie Mae Persons, 266 Ala. 406, 96 So.2d 673, and Birmingham Transit Company, a Corporation, v. Joe T. Persons, 266 Ala. 406, 96 So.2d 673, Act 670 was held invalid on original deliverance. Pending decision on application for rehearing in those cases, however, the parties reached an agreement and the original opinion was withdrawn. That original opinion referred also to the case of Sibley v. Odum, 257 Ala. 292, 58 So.2d 896, wherein Act No. 670 was considered. In the Birmingham Transit Company cases, supra, on original deliverance, we stated in pertinent part as follows:

"* * * the rule is to the effect that a count * * * which alleges that a corporate defendant wantonly injured the plaintiff, being in trespass requires proof of corporate participation, authorization or ratification and in the absence of such proof the defendant is entitled to the general affirmative charge with hypothesis when requested in writing. Birmingham Ry., L. & P. Co. v. Hayes, 153 Ala. 178, 44 So. 1032; Reed v. Ridout's Ambulance, Inc., 212 Ala. 428, 102 So. 906. If there be any statements in Atlantic Coast Line R. Co. v. Brackin, 248 Ala. 459, 28 So.2d 193, decided in 1946, in conflict with the

holdings in the Hayes and Reed cases, supra, such statements are disapproved.

"Our holdings in the Hayes and Reed cases, supra, are based on the case of City Delivery Co. v. Henry, 139 Ala. 161, 34 So. 389, decided by this court in 1903, which has been criticized on more than one occasion, but never overruled by this court on the point here involved. Newberry v. Atkinson, 184 Ala. 567, 64 So. 46; Louisville & N. R. Co. v. Abernathy, 197 Ala. 512, 73 So. 103; Central Iron & Coal Co. v. Wright, 212 Ala. 130, 101 So. 824.

"Following the Henry case, supra, we have consistently reversed upon failure of the trial judge to give the general affirmative charge with hypothesis as requested by the defendant in the absence of proof of direct corporate action where the complaint was so drawn as to require such proof, irrespective of Circuit Court Rules 34 and 35, adopted originally on June 23, 1913 (175 Ala. XXI), providing that the trial court will not be put in error for refusing the affirmative charge where predicated upon a variance curable by an amendment of the pleading, or upon a failure of proof 'not involving a substantive right of recovery or defense,' unless the point of variance or failure has been called seasonably and specifically to the attention of the court. W. E. Belcher Lumber Co. v. York, 245 Ala. 286, 17 So.2d 281; DeBerry v. Goodyear Tire & Rubber Co., 237 Ala. 223, 186 So. 547; Alabama Power Co. v. Gooch, 221 Ala. 325, 128 So. 793; National Life & Accident Ins. Co. v. Cruso, 216 Ala. 421, 113 So. 396; Louisville & N. R. Co. v. Bartee, 204 Ala. 539, 86 So. 394, 12 A.L.R. 251; Ex parte Louisville & N. R. Co., 203 Ala. 328, 83 So. 52. But inasmuch as an averment that the 'defendant' negligently did the wrongful act can be supported by proof that defendant's servants or agents did the act of negligence while acting within the line and scope of their employment by the defendant, Circuit Court Rule 34 has been held to apply where the complaint charged the negligent act to the defendant but the proof showed that the act of negligence was done by the defendant's servants or agents while acting within the line and scope of their employment. Morrison v. Clark, 196 Ala. 670, 72 So. 305; Hill v. Almon, 224 Ala. 658, 141 So. 625; Watkins v. Reinhart, 243 Ala. 243, 9 So.2d 113.

"Tommie Mae Persons, the appellee in 6 Div. 795, contends that the trial court did not commit reversible error in refusing the request of the defendant for the general affirmative charge with hypothesis as to Count A in that case, although there was no proof of direct corporate participation in the alleged wanton injury ascribed directly to the defendant, or authorization or ratification thereof, for the reason that the need of such proof had been dispensed with by Act 670, approved October 9, 1947, General Acts 1947, p. 513, which act, in pertinent parts, reads as follows:

"'Section 1. In any civil action against any person, firm or corporation, or against any person, firm or corporation and any agent, servant or employee of such person, firm or corporation, involving any act or conduct of an agent, servant or employee of such person, firm or corporation, whether such act or conduct was negligent, wanton, intentional or willful, it shall be proper and permissible to join the agent, servant or employee as a defendant and to state the cause of action against all defendants in the same count, and such pleading, practice and procedure shall not be deemed to be a misjoinder of parties or of causes of action even though the action against one defendant be trespass on

the case and the action against another defendant be an action of trespass. *In any such action it shall be permissible to allege in any pleading that any party or parties committed an act, and proof that any such party or parties committed such act by or through an agent, servant or employee acting within the line and scope of his employment shall be sufficient proof of such allegation.*' (Emphasis supplied)

\* \* \* \* \* \*

"On the first rehearing in the case of Sibley v. Odum, 257 Ala. 292, 58 So.2d 896, 'we concluded to the invalidity' of Act 670, supra, but on further rehearing consideration of that Act was 'laid entirely out of view,' since it was determined that such consideration was unnecessary to a decision and because 'the act had not been brought into notice on the trial and was not relied upon or mentioned on the appeal by either party.'

"In the case at bar no mention of Act 670, supra, appears to have been made during the trial below. However, that act is expressly relied upon by the appellees and the appellant attacks its validity. We feel constrained, therefore, to pass upon the validity of Act No. 670 on this appeal.

"We think it clear that by the passage of Act No. 670, supra, the legislature sought to change two rules long ago established by the decisions of this court. One of those rules, that thought to be involved in Sibley v. Odum, supra, is that an action in trespass against employee and an action in case against his employer cannot be joined in the same count. Southern Bell Tel. & Tel. Co. v. Francis, 109 Ala. 224, 19 So. 1 [31 L.R.A. 193]; Southern Ry. Co. v. Hanby, 166 Ala. 641, 52 So. 334; Interstate Lumber Co. v. Duke, 183 Ala. 484, 62 So. 845; Louisville & N. R. Co. v. Abernathy, 197 Ala. 512, 73 So. 103; Crotwell v. Cowan, 240 Ala. 119, 198

So. 126. The other rule is that insisted upon by appellant on this appeal, to which we have already referred, that is, Where a count charges a corporate defendant with trespass *vi et armis,* proof of actual participation on the part of the defendant in the damnifying act is essential. City Delivery Co. v. Henry, supra; Birmingham Ry., L. & P. Co. v. Hayes, supra; Reed v. Ridout's Ambulance, Inc., supra.

"Act No. 670, supra, contains no severability clause and all of its provisions must stand or fall together.

"We have carefully reconsidered our observations made on the first rehearing in Sibley v. Odum, supra, concerning Act No. 670, supra, and are convinced that said act must be declared invalid for the reasons there asserted.

"In the opinion released on first rehearing in Sibley v. Odum, supra, we said in pertinent parts as follows:

" 'Original deliverance was made without discussing the effect of Act No. 670, General Acts 1947, p. 513 (§ 138 [1], Title 7, Code 1940), upon the matter of pleading. Though the subject was not raised or discussed in briefs, the act is germane to decision; so we placed the case on the rehearing docket to consider the question. It will be treated later in the opinion.

\* \* \* \* \* \*

" 'The act has had our careful study and we are clear to the conclusion that we cannot give effect to it according to its terms. It is inconsistent and unworkable. While we recognize in general the right and power of the legislature to prescribe rules of pleading and practice and of evidence, we have also referred to the fact that the court is of constitutional origin, the same as the legislature, and has powers of common law descent which are implied by the terms used in the

Constitution. This means that the ju-. dicial power is coordinate with the legislative, and neither can encroach upon the other. We have applied that principle to hold that the legislature cannot validly pass a law which will impede the functioning of the court. Ex parte Foshee, 246 Ala. 604, 606(1), 21 So.2d 827; Southern Ry. Co. v. Hanby, 166 Ala. 641, 52 So. 334. So that if the legislature enacts a law which is repugnant to the ordinary power and proper functioning of the court, we very reluctantly point that out in declining to abide by it.

" 'With respect to the act in question, briefly speaking, it authorizes the joinder in the same count, a cause of action in trespass against one defendant and one in case against another defendant jointly sued. To permit that would result in many incongruities and would upset principles which are controlling in the orderly procedure of court, as we will undertake to show.

" 'Trespass and case are not defined by statute. Their elements are of common law origin. Trespass is one of the ancient writs. Case arose to meet a situation not covered by any of those writs. Trespass is of three aspects: (1) *vi et armis* (personal injuries by force directly applied); (2) *de bonis asportatis* (the carrying away of the goods of another); (3) *quaere clausum fregit* (direct injuries to the freehold).

" 'They all carry the necessary element of an intentional (or wanton, its equivalent in law), direct application of force by the defendant or under his authority. Unless there is such direct force, there can be no trespass in any aspect.

" '*Case* is when injury occurs to the person or property of another when as to the defendant so charged there is no intentional direct application of force, but either a negligent unintentional application, or when the act was intentionally committed by one who is guilty of a trespass, but the defendant is legally responsible for such willful act of the other on such principle as *respondeat superior*. In that event the one is guilty of a trespass and for such trespass the other is responsible in case, because he did not commit a trespass and there was no writ which provided a remedy.

" 'The effect of this act of the legislature is to provide that when these two respective claims exist they may be united in a suit and in the same count against the one who committed the trespass and the one who is consequentially responsible, both jointly sued. The act further provides that if the count alleges the commission of a trespass it may be established by proof of a claim in case. Incongruous situations would thereby result:

" 'One committed a trespass, the other did no wrong. There can be no separate judgments against defendants in different amounts. The judgment against them must be a certain sum against them jointly. Yet one may have done a vicious and intentional act, and the other was not a party to it, though legally responsible. City of Tuscaloosa v. Fair, 232 Ala. 129, 167 So. 276. In any event the claim against them each separately is on a different theory of liability and is not joint, though they are jointly sued. It is incongruous for a count to mean one thing against one defendant and another against the other defendant, jointly sued. They will not mix. The law cannot make oil and water mix.

" 'Moreover, there is a different statute of limitations applicable to the same count as to a trespass charge and to a case charge. One is six years, the other one year. A count cannot be susceptible to different pe-

riods of limitations as to different defendants jointly sued.

" 'We doubt not that the legislature may do away with one or the other form of action and make a form of action suffice regardless of whether the ancient distinction is carried forward. But in doing so, it should state whether the new action shall be called trespass or case, affix a limitation to it, and do away with the common law distinctions and requirements as to each separately and make provisions about contributory negligence. But this act recognizes the continued existence of both with their respective inherent qualities and distinctions and tries to unite them in one suit in which they cannot unite. There must be but one form of action in a single count, and it must be clear what that form is and what are its qualities, limitations and elements.

" 'Title 7, § 223, form 25 is in trespass in taking goods; form 28 is in trespass to land; form 18 is in trespass for an assault and battery; form 19 in trespass for false imprisonment. But form 20 is in case for malicious prosecution (Caldwell v. Standard Oil Co., 220 Ala. 227, 124 So. 512).

" 'The act here in question allows a plaintiff to sustain a claim against defendant when it alleges a trespass, but the proof shows no trespass by that defendant at all, but only an indirect responsibility for the trespass of another. So that when a defendant is alleged to have committed a trespass he is not by such allegations apprised of the fact that a claim in case subjects him to liability. He is entitled to know by proper allegation what plaintiff's claim against him is, and what statute of limitations applies, so he can know how to plead and prepare his defense in other respects. One defendant cannot have a limitation of six years fixed by law to him, and the other defendant have a one year limitation, all as

to the same count. Such pleas are not personal to the separate defendants.

" 'This does not rationalize away the general principle that a suit against two or more defendants in a tort action is several as well as joint, and a judgment may be rendered against one and in favor of the other. § 139, Title 7, Code. For in a suit against master and servant for wanton or willful wrong by a servant, if the servant is acquitted, the master is entitled to an acquittal, notwithstanding that statute.

" 'Thus, by reason of its incongruous posture and manifest inconsistency, the act is impossible of execution, of consequence of which we must, though regretfully, declare it inoperative and without effect. Dewrell v. Kearley, 250 Ala. 18, 32 So.2d 812; Opinion of the Justices, 249 Ala. 88, 30 So.2d 14, 17.' "

■ In the instant case, since there was no proof of corporate participation in the damnifying act, the defendant corporation was entitled to the general affirmative charge with hypothesis requested to Count 6.

Assignments of Error 13, 14, 19, 20 and 34.

In City Delivery Co. v. Henry, 139 Ala. 161, 166, 34 So. 389, 390, the second and fourth counts averred that "the defendant, through its agent or servant * * * wantonly, willfully, or intentionally caused an ice wagon to run against plaintiff * *."

■ In the instant case, Count 7 averred that " * * * defendant, acting by and through its agents, servants or employees, willfully or wantonly allowed said detached freight cars to roll along said tracks * * * against the person of plaintiff's intestate * * * and that the willful or wanton acts of defendant, acting by and through its agents, servants or employees thereby willfully or wantonly killed plaintiff's intestate on said occasion." On the authority of City Delivery Co. v. Henry,

supra, Count 7 charged trespass and to sustain this count proof of corporate participation was necessary.

■ Appellee argues that even if Act 670, supra, be invalid, refusal of the affirmative charge to Counts 6 and 7 was error without injury because the verdict may be referred to Counts C and 8. This contention has been decided adversely to appellee in Jordan v. Henderson, 258 Ala. 419, 421, 63 So.2d 379, 381, where it was said:

"The doctrine of error without injury cannot be applied to the refusal of a charge denying the plaintiff's right to recovery under one of the counts of the complaint which was not supported by any evidence, merely because there was evidence tending to support the other count, and the verdict of the jury was probably founded on them. (Citations omitted.)"

The same considerations above set out as to Count 6 apply to Count 7 and refusal of the affirmative charge with hypothesis to Count 7 was error to reverse.

Assignments of Error 7, 8 and 9.

Counts 6, 7 and 8 contain an allegation to the effect that the intestate, Johns, was crossing the tracks of defendant "at a point, to-wit: 250 feet South" of Rural Street Crossing and "at a point and time when the public were wont to cross" etc.

Evidence was admitted, over the objection of defendant, to show that the public were wont to cross the tracks at points between the two crossings other than the point where Johns was injured. Appellant assigns as error the admission of such evidence over timely objection.

The evidence in this regard did show that people were accustomed to cross the tracks over the entire area between the crossings, including the point where Johns was struck. Appellant contends that proof of the crossing custom should have been limited to the precise point of the injury as alleged in the complaint.

■ We do not agree. In Southern Ry. Co. v. Shipp, 169 Ala. 327, 334, 335, 53 So. 150, 153, it was said:

"* * * The court properly allowed proof of the fact that people frequently and constantly crossed the track of the railroad at a point where plaintiff and his child were crossing at the time of the injury. While such a custom of the public to use such path as a crossing of defendant's track might not give the public or plaintiff any absolute right to cross the track, or might not prevent them from being trespassers when so using the track—though as to this we do not decide—yet such evidence was competent and relevant to show the degree of care required to be exercised by the defendant's agents in moving their trains across such point of its track so used by the public as this was shown to have been used, and as tending to charge them with notice of such use by the public."

In Watts v. Atlantic Coast Line R. Co., 256 Ala. 352, 357, 54 So.2d 601, 605, it was said:

"* * * Evidence that persons living in the neighborhood or the public use the railroad way for longitudinal passage for their own convenience is admissible in connection with other evidence to show wanton or wilful injury on the part of the agents or servants of the railroad company in charge of the train. * * *"

If it was the custom at Evergreen to cross the tracks over the entire area between the two public crossings, and the spot where Johns was struck lay within that area, then he was struck at a point where the custom was to cross. The fact that the custom to cross included other points between the public crossing did not change the character of the place where he crossed nor lessen the degree of care required of defendant.

Louisville & N. R. R. Co. v. Porter, 196 Ala. 17, 71 So. 334, relied on by appellant is not in conflict with this holding. In that

case, "Deceased was not crossing the track according to the custom * * *," and it was held that objection to plaintiff's question about the footpath should have been sustained. In the case at bar, there was evidence that Johns was crossing according to custom when he was struck. Admission of evidence to show the custom was not error.

### Assignment of Error 10.

Assignment of error 10 is that the court erred in overruling appellant's objection to a hypothetical question propounded by plaintiff to the witness, Bethea, because the question was not supported by the evidence. Appropriate here is what was said by the late Chief Justice Anderson as follows:

"Of course, there should be a correct hypothesis for hypothetical questions, and whether or not they existed in the examination of Robinson or were subsequently supplied by the defendant's evidence, so as to prevent reversible error, we need not decide, as the cause must be reversed for other reasons, and the questions on the next trial can conform to the rule." Louisville & N. R. R. Co. v. Calvert, 172 Ala. 597, 602, 603, 55 So. 812, 814.

### Assignments of Error 23, 24, 27 and 28.

Refused charges 5 and 11 requested by appellant categorically state to the jury that the deceased, Johns, under the evidence, was a trespasser when he was struck. For this reason, if for no other, these charges were refused without error.

Under the aspect of the evidence favorable to plaintiff, Johns was crossing the team track at the time he was injured, albeit he did not stop, look, or listen before going on the track; and, under that aspect, Johns was not a trespasser. We have said:

" * * * it is well settled that one who merely crosses over the tracks of a railroad does not assume the attitude of a trespasser. (Citations omitted.)" Rush v. Central of Georgia Ry. Co., 223 Ala. 119, 121, 134 So. 619, 621.

"It is not negligence in itself for one to *cross over* a railroad track wherever he may have occasion to do so. Before making the attempt, however, he must know that no train, engine, or car is approaching in such proximity as to render the undertaking dangerous. * * * For the law does not contemplate that railroads, road beds and tracks shall impede travelers, whether along highways or across country, any more than their physical conformation may of necessity involve; and, while the traveler may be negligent in attempting to cross without proper circumspection, he is never a trespasser, because he is never without this qualified right to pass over." Glass v. Memphis & Charleston Railroad Co., 94 Ala. 581, 587, 10 So. 215, 217.

See also the following: Stringer v. Alabama Mineral Railroad Co., 99 Ala. 397, 13 So. 75; Alabama Great Southern Railroad Co. v. Linn, 103 Ala. 134, 15 So. 508; Birmingham Railway & Electric Co. v. City Stable Co., 119 Ala. 615, 24 So. 558; Highland Avenue & Belt Railroad Co. v. Robbins, 124 Ala. 113, 27 So. 422; Tennessee Coal, Iron and Railroad Co. v. Hansford, 125 Ala. 349, 28 So. 45; Lloyd v. Central of Georgia Ry. Co., 200 Ala. 694, 77 So. 237; Louisville & N. Railroad Co. v. Johnson, 201 Ala. 611, 79 So. 43; Louisville & N. R. Co. v. Sullivan, 244 Ala. 485, 13 So.2d 877.

### Assignments of Error 25 and 26.

Refused Charge 6 recites as follows:

"6. The Court charges the jury that under the evidence in this case the only duty owed by Defendant to deceased was to exercise reasonable care to avoid injuring him after his peril was discovered."

Appellant relies on Kendrick v. Birmingham Southern R. Co., 254 Ala. 313, 48 So.2d 320, to support his argument that refusal of Charge 6 was error, and asserts that Charges 12 and 14 given in the Kendrick case, supra, " * * * set out the same rule of law which we were attempting

to set out by the requested charges being discussed in this case." We do not agree.

Moreover, in the Kendrick case, supra, the opinion contains this statement:

"* * * they show plaintiff's intestate to have been a trespasser on defendant's tracks, to whom the defendant owed no duty other than not to negligently injure him after his peril was discovered by the agent or servant in charge of the locomotive, or not to wilfully or wantonly injure him. * * *" 254 Ala. 313, 319, 48 So.2d 320, 325.

In the instant case, even if Johns were a trespasser, as appellant contends, the appellant owed Johns a duty not to injure him willfully or wantonly.

Charge 6 omits to state that defendant owed a duty not to injure deceased by willful or wanton misconduct. For this reason, if for no other, Charge 6 was refused without error.

### Assignments of Error 29 and 30.

Refused Charge 14, if not subject to the same objection as refused Charges 5 and 11, was adequately covered by given Charges 8, 10, 12 and 13 requested by defendant, and Charge 14 was refused without error.

We have considered all assignments of error argued by appellant. For refusal of the affirmative charge with hypothesis to Counts 6 and 7 requested in writing by appellant, and for giving those portions of the oral charge excepted to by appellant, the cause must be reversed and remanded.

Reversed and remanded.

LIVINGSTON, C. J., and LAWSON, SIMPSON, GOODWYN and MERRILL, JJ., concur.

1. Ante p. 245.